## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **REBECCA A. REDMAN,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:14cv00016** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | **BY: PAMELA MEADE SARGENT** |
| **Defendant** | ) | **United States Magistrate Judge** |

### *I. Background and Standard of Review*

Plaintiff, Rebecca A. Redman, ("Redman"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Redman protectively filed an application for DIB on October 6, 2010, alleging disability as of January 1, 2008, due to severe depression, anxiety, arthritis, a bleeding cyst on her ovary, crying spells, fatigue, back pain, racing thoughts and blood pressure problems. (Record, ("R."), at 158-59, 200, 204, 235.) The claim was denied initially and on reconsideration. (R. at 81-83, 93-96, 98-100.) Redman then requested a hearing before an administrative law judge, ("ALJ"). (R. at 101.) A hearing was held on December 21, 2012, at which, Redman was represented by counsel. (R. at 28-51.)

By decision dated January 10, 2013, the ALJ denied Redman's claim. (R. at 14-25.) The ALJ found that Redman met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2014. (R. at 16.) The ALJ also found that Redman had not engaged in substantial gainful activity since January 1, 2008, her alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Redman suffered from severe impairments, namely arthritis, ovarian cyst, high blood pressure, depression, anxiety and bipolar disorder, but he found that Redman did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404,

-2-

Subpart P, Appendix 1. (R. at 16-17.) The ALJ found that Redman had the residual functional capacity to perform light work,[1] which did not require more than frequent balancing or climbing of ramps and stairs; that did not require more than occasional climbing of ladders, ropes and scaffolds, stooping, kneeling, crouching and crawling and interaction with the general public; that did not expose her to concentrated exposure to hazards; and that required only one- to two-step job instructions. (R. at 18.) The ALJ found that Redman was unable to perform any of her past relevant work. (R. at 23.) Based on Redman's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Redman could perform, including jobs as a small product assembler, a routing clerk and a garment folder. (R. at 24.) Thus, the ALJ found that Redman was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 25.) *See* 20 C.F.R. § 404.1520(g) (2015).

After the ALJ issued his decision, Redman pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-4.) Redman then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Redman's motion for summary judgment filed November 21, 2014, and the Commissioner's motion for summary judgment

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

-3-

filed December 23, 2014.

## II. Facts

Redman was born in 1970, (R. at 158), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education and past relevant work experience as shoe salesperson, a general retail sales person, a day care worker and a housekeeper/cleaner. (R. at 33-34, 47, 205.) Redman testified at her hearing that medication helped her symptoms of depression "a lot." (R. at 37-38.) She stated that her back pain made her depression worse. (R. at 38.) Redman stated that the best treatment for her anxiety was to be around people and situations that she knew. (R. at 38.)  She stated that she enjoyed reading and going outdoors. (R. at 41.) Redman stated that she attended her daughter's activities, such as sporting events, but was unable to sit through a whole game. (R. at 41, 43.) Redman stated that she isolated herself at least one week out of the month. (R. at 45.)

Mark Hileman, a vocational expert, also was present and testified at Redman's hearing. (R. at 46-50.) Hileman classified Redman's past work as a shoe salesperson and as a general retail sales person as light and semi-skilled; her work as a day care worker as light and semi-skilled; however, Hileman stated that Redman performed this job at the medium[2] exertional level; and her work as a

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she

-4-

housekeeper/cleaner as light and unskilled. (R. at 47-48.) Hileman was asked to consider a hypothetical individual of Redman's age, education and work history, who had the residual functional capacity to perform light work that did not require more than frequent balancing or climbing of ramps and stairs; that did not require more than occasional climbing of ladders, ropes and scaffolds, stooping, kneeling, crouching and crawling and interaction with the general public; that did not require concentrated exposure to hazards; and that required only one- to two-step job instructions. (R. at 48.) Hileman stated that such an individual could perform Redman's past work as a housekeeper/cleaner, in addition to other jobs that existed in significant numbers, including jobs as a small products assembler/bench assembler, a routing clerk and a garment folder and packager. (R. at 48-49.) When asked if the hypothetical individual also was emotionally unstable to work, Hileman stated that there would be no jobs available that the individual could perform. (R. at 49.) Hileman was asked to consider a hypothetical individual who had no useful ability to deal with the public, to deal with work stresses, to maintain attention and concentration, to behave in an emotionally stable manner, to relate predictably in social situations and who would be absent more than two workdays per month. (R. at 49-50.) He stated that there would be no jobs available that such an individual could perform. (R. at 50.)

In rendering his decision, the ALJ reviewed medical records from Norton City Public Schools; Dr. Michael Hartman, M.D., a state agency physician; Jo

---

also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2015).

McClain, P.C., a state agency mental health professional; Julie Jennings, Ph.D., a state agency psychologist; Dr. John Sadler, M.D., a state agency physician; Norton Community Hospital; Wellmont Holston Valley Medical Center, ("Holston Valley"); Mountain View Regional Medical Center; Wise Orthopedic Clinic; Holston Valley Specialty OB/GYN; Indian Path Medical Center; Dr. Kurt A. Ick, M.D.; Cloverleaf Chiropractic; Dr. Ronald Smith, M.D.; Dr. Larry Hartman, M.D.; Mountain States Rehabilitation; Dr. William M. Platt, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Jessica Pope, PA-C, a certified physician's assistant; Dr. Gregory Corradino, M.D.; Dr. Steven R. Prince, M.D.; Stacey B. Gipe, P.A.-C, a certified physician's assistant; Dr. James W. Campbell, D.O.; Dr. Sachdev Somiah, M.D., a psychiatrist; and Dr. S.C. Kotay, M.D.

On July 20, 2004, Dr. Ronald Smith, M.D., reported that, diagnostically, Redman showed evidence of bipolar disorder, depressed phase, and a generalized anxiety disorder. (R. at 663.)

On October 3, 2008, Redman presented to the emergency room at Norton Community Hospital for complaints of low back pain. (R. at 327-44.) A CT scan of Redman's abdomen and pelvis showed gallstones and stones in both kidneys. (R. at 343.) She was diagnosed with acute low back pain, acute strain/sprain of the lumbosacral region and acute sciatica of the left side. (R. at 328.) On February 1, 2010, and March 18, 2010, ultrasounds of Redman's retroperitoneum, liver and gallbladder showed suspected bilateral kidney stones and suspicion of fatty infiltration of the liver. (R. at 345, 347.) On October 11, 2012, Redman underwent

exploratory laparotomy, repair of ventral hernias, cholecystectomy and appendectomy. (R. at 736, 745-46, 763.) She did well postoperatively and was discharged on October 17, 2012, with no complaints. (R. at 736.)

On October 15, 2008, Redman underwent dilatation and curettage, ("D&C"), with hysteroscopy and adhesion removal at Holston Valley. (R. at 296-97, 407-08.) On January 13, 2009, Redman underwent a total abdominal hysterectomy due to dysfunctional bleeding and menorrhagia. (R. at 299-303, 404-06.) Upon discharge, Redman was doing well and had no problems. (R. at 299.) Subsequent progress notes indicate that she continued to do well. (R. at 309, 388-89, 392.)

The record shows that Redman has been treated by Dr. Steven R. Prince, M.D., and Stacey B. Gipe, PA-C, a certified physician's assistant, since May 1996 for complaints of depression and anxiety. (R. at 608-10, 619-20, 622, 628, 631, 636.) On February 17, 2006, Gipe diagnosed Redman with bipolar disorder, then-currently depressed. (R. at 599.) On February 24, 2006, Redman reported that she was less depressed, but was not back to normal. (R. at 598.) On March 23, 2006, Redman reported that she was doing a lot better on medication. (R. at 596.) On June 30, 2006, Redman reported that she was doing great. (R. at 592.) She reported that she was completely back to normal. (R. at 592.)

On January 18, 2007, Redman reported that she was doing well on medication. (R. at 591.) On April 9, 2007, Redman reported that she was severely depressed; however, on April 26, 2007, Redman reported that she was doing 100

-7-

percent better since taking Zoloft and that she was not manic. (R. at 589-90.) On September 4, 2007, Redman reported that she had not been manic or depressed and that she was doing much better. (R. at 586.) On October 4, 2007, Redman reported that she felt 100 percent better since starting Cymbalta. (R. at 584.) She stated that she was not manic at all. (R. at 584.) Gipe reported that Redman's affect was "wonderful." (R. at 584.) On November 29, 2007, Gipe diagnosed lumbosacral strain and probable urinary tract infection after Redman complained of low back pain. (R. at 583.)

On April 24, 2008, Redman reported that her medication helped her low back pain "a great deal." (R. at 313.) On September 18, 2008, Redman reported being more anxious than normal. (R. at 311.) Gipe noted that Redman's affect was good, she was not manic and did not appear depressed. (R. at 310.) On November 11, 2008, Redman complained of exacerbation of depression. (R. at 310.) She reported that she did get "a little manic." (R. at 310.) Redman stated that she had gone to the emergency room for low back pain and had been given a muscle relaxant, which had been very helpful. (R. at 310.) Redman had full range of motion of her back and negative straight leg raising tests. (R. at 310.) On February 23, 2009, Redman reported that she was "doing quite well," stating that she felt better than she had in a long time. (R. at 309.) On June 2, 2009, Gipe reported that Redman's affect was "excellent." (R. at 308.) Redman reported that she was "doing quite well," that her "nerves" were doing great and that her blood pressure was much better. (R. at 308.) Gipe noted that Redman's low back pain had resolved since having had a hysterectomy. (R. at 308.)

-8-

On January 18, 2010, Redman reported that her mania had calmed down and that she was feeling much better on medication. (R. at 366.) Gipe noted that Redman was not depressed or manic. (R. at 366.) She reported that Redman was very unwilling to take a mood stabilizer unless she started becoming manic. (R. at 366.) Gipe reported that Redman's blood pressure was much better, and her affect was good. (R. at 366.) Redman did not appear manic, depressed or anxious. (R. at 366.) On February 28, 2010, an MRI of Redman's lumbar spine showed a narrowed rightward L5-S1 intervertebral canal with suspect nerve root compression. (R. at 355-56.) It was noted that this was on the side opposite of Redman's symptoms. (R. at 356.) On June 16, 2010, Redman reported that she was doing quite well. (R. at 367.) She denied having trouble with anxiety. (R. at 367.) She stated that she had a couple of manic episodes, but did not want to take a mood stabilizer. (R. at 367.) Gipe reported that Redman's affect was "very good." (R. at 367.) Redman appeared happier and stated that her back was 100 percent better since she had been treating with a chiropractor and had stopped passing kidney stones. (R. at 367.) On December 23, 2010, Redman reported severe depression for the previous two months. (R. at 541.) Gipe noted that Redman was willing to try a mood stabilizer. (R. at 541.) Gipe also noted that she offered to refer Redman to a psychiatrist in the past, but Redman's interest made it very difficult. (R. at 541.) Redman's thought processes were very clear, and she was able to give a clear history. (R. at 541.) She did not appear manic, but was somewhat depressed. (R. at 541.)

On February 14, 2011, Redman reported that she was doing much better. (R.

at 549.) She stated that she was able to function on a day-to-day basis. (R. at 549.) Redman reported that her mood did not affect her daily activity and that her blood pressure was well-controlled. (R. at 549.) Gipe referred Redman to psychiatry for evaluation due to her intermittent flares and for her recent application for disability. (R. at 550.) On May 17, 2011, Gipe reported that Redman's affect looked good. (R. at 565.) On October 4, 2011, Redman reported that she was doing really well. (R. at 664.) Gipe reported that Redman's affect was very good, and she did not appear manic or depressed. (R. at 664.)

On October 11, 2011, Gipe completed a physical assessment, indicating that Redman could occasionally lift and carry items weighing up to 10 pounds. (R. at 673-75.) She found that Redman could stand and/or walk up to two hours without interruption. (R. at 673.) Gipe found that Redman's ability to sit was not impaired. (R. at 674.) She opined that Redman could occasionally climb, stoop, kneel, balance, crouch and crawl. (R. at 674.) Gipe stated that Redman was not emotionally stable to work. (R. at 675.) This assessment was also signed by Dr. James W. Campbell, D.O. (R. at 675.)

That same day, Gipe completed a mental assessment, indicating that Redman had an unlimited ability to maintain personal appearance. (R. at 676-78.) She opined that Redman had a limited, but satisfactory, ability to follow work rules, to function independently, to understand, remember and carry out complex, detailed and simple instructions and to demonstrate reliability. (R. at 676-77.) Gipe found that Redman had a seriously limited ability to relate to co-workers, to use

-10-

judgment and to interact with supervisors. (R. at 676-77.) She found that Redman had no useful ability to deal with the public, to deal with work stresses, to maintain attention and concentration, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 676-77.) This assessment also was signed by Dr. Campbell. (R. at 678.)

On November 17, 2011, Redman requested that she be referred to a back specialist for her chronic low back pain. (R. at 717.) Gipe noted that Redman was in no distress, and she had negative straight leg raises. (R. at 717.) An MRI showed possible nerve compression on the right; however, Redman's symptoms were more on the left. (R. at 717.) On March 14, 2012, Redman complained of dysuria, increasing low back pain and lower abdominal discomfort. (R. at 716.) Gipe noted a trigger point over Redman's left SI joint. (R. at 716.) Redman had full range of motion of her lower back and negative straight leg raises. (R. at 716.) Gipe diagnosed a urinary tract infection and chronic low back pain. (R. at 716.) On April 5, 2012, Redman was seen for follow-up of her emergency room visit from the previous night. (R. at 714.) She reported presenting to the emergency room with excruciating low back pain, numbness and tingling down both legs and an inability to walk due to severe pain. (R. at 714.) Redman stated that she was given an injection of corticosteroid and prescribed pain medication, a muscle relaxer and an antibiotic. (R. at 714.) Redman reported that she was still hurting, but she had markedly improved from the previous night. (R. at 714.) Gipe diagnosed chronic low back pain with bulging disc, but no overt herniated disc; ventral abdominal wall hernia, asymptomatic; nephrolithiasis; and urinary tract infection. (R. at 714.)

-11-

On October 24, 2012, Dr. Campbell saw Redman for follow-up after her hospital admission for general surgery for a ventral hernia, repair of a couple of different abdominal hernias, cholecystectomy and appendectomy. (R. at 711-13.) Redman reported doing better since discharge. (R. at 711.) Her physical examination was normal with the exception of abdominal tenderness along the surgical incision site. (R. at 711-12.) Dr. Campbell diagnosed muscle spasm; abdominal pain, status-post surgery; hypoxia; essential hypertension; moderate, recurrent major depression; and anxiety disorder, not otherwise specified. (R. at 712.)

On March 4, 2011, Dr. Sachdev Somiah, M.D., a psychiatrist, evaluated Redman. (R. at 559-61.) Dr. Somiah reported that Redman's depression and anxiety were mild; she had clear speech; full affect; and organized thought process. (R. at 561.) Redman had intact memory, cognitive function, abstraction, judgment and insight. (R. at 561.) Dr. Somiah diagnosed bipolar depression, recurrent, moderate and assessed Redman's then-current Global Assessment of Functioning score, ("GAF"),[3] at 70.[4] (R. at 561.)

On August 24, 2009, Redman underwent a complex uroflow, a complex

---

[3] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[4] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

cystometrogram and a cystoureteroscopy at Mountain View Regional Medical Center for recurrent urinary tract infections and a neurogenic bladder. (R. at 321-22.)

On February 26, 2010, Dr. Kurt A. Ick, M.D., saw Redman for complaints of recurrent urinary tract infections. (R. at 358.) Dr. Ick noted that Redman's low back pain was most likely musculoskeletal in nature, but he ordered an ultrasound to rule out any other kidney pathology. (R. at 358.) On April 1, 2010, an office cystoscopy was performed, which showed some mild cystitis cystica changes at the bladder neck consistent with chronic cystitis. (R. at 360.) On April 16, 2010, Redman underwent an extracorporeal shock wave lithotripsy, ("ESWL"), for a left kidney stone. (R. at 462.) On May 21, 2010, x-rays showed a kidney stone in the left kidney, and on May 24, 2010, Redman underwent a left uteroscopy, laser and stenting. (R. at 456-57, 461, 482-83.)

On February 16, 2010, Redman saw Dr. S.C. Kotay, M.D., for complaints of low back pain. (R. at 363.) Dr. Kotay reported tenderness in Redman's lower lumbar area on the left side. (R. at 363.) Straight leg raising tests were negative bilaterally. (R. at 363.) Redman had normal reflexes, motor strength and gait. (R. at 363.) X-rays of Redman's lumbar spine showed only mild degeneration at the L5-S1 disc space. (R. at 363.) On March 16, 2010, Dr. Kotay noted that Redman's lumbar spine MRI showed degenerative disease at the L4-L5 level with mild foraminal stenosis on the left side. (R. at 359, 376-77.) Dr. Kotay planned to continue conservative treatment with lumbosacral corset, anti-inflammatory

-13-

medication and muscle relaxants. (R. at 359.)

The record shows that Redman was treated at Cloverleaf Chiropractic from June 12, 2010, through December 15, 2010. (R. at 508-26, 539.) On June 21, 2010, Redman reported that her back pain had improved. (R. at 515.) On June 30, 2010, Redman reported increased low back pain after falling off of a bicycle. (R. at 516.) In July 2010, Redman reported that she was doing well. (R. at 517, 520.) On August 30, 2010, Redman reported increased pain in her right hip after falling off of a bicycle. (R. at 525.) In October 2010, Redman reported that she was doing well. (R. at 530-32.)

On January 5, 2011, Dr. Michael Hartman, M.D., a state agency physician, opined that Redman had the residual functional capacity to perform medium work. (R. at 58-60.) He noted that Redman could frequently climb ramps and stairs, balance, stoop, kneel and crouch and occasionally climb ladders, ropes and scaffolds and crawl. (R. at 59.) No manipulative, visual or communicative limitations were noted. (R. at 59.) Dr. Hartman found that Redman should avoid concentrated exposure to hazards. (R. at 60.)

On February 23, 2011, Jo McClain, P.C., a state agency mental health professional, completed a mental assessment, indicating that Redman had no significant limitations in her ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple

-14-

work-related decisions; to ask simple questions or request assistance; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public transportation. (R. at 60-62.) She found that Redman had moderate limitations in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. at 60-62.) She opined that Redman could perform simple and nonstressful work. (R. at 62.)

On August 22, 2011, Dr. John Sadler, M.D., a state agency physician, opined that Redman had the residual functional capacity to perform light work. (R. at 73-75.) He noted that Redman could frequently climb ramps and stairs and balance and occasionally climb ladders, ropes and scaffolds, stoop, kneel, crouch and crawl. (R. at 74.) No manipulative, visual or communicative limitations were noted. (R. at 74.) Dr. Sadler found that Redman should avoid concentrated exposure to hazards. (R. at 75.)

-15-

On August 25, 2011, Julie Jennings, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Redman suffered from an affective disorder. (R. at 72.) She opined that Redman had no restrictions on her ability to perform her activities of daily living. (R. at 72.) Jennings found that Redman had moderate limitations on her ability to maintain social functioning and to maintain concentration, persistence or pace. (R. at 72.) She found that Redman had not suffered from repeated episodes of decompensation for an extended duration. (R. at 72.)

Jennings also completed a mental assessment, indicating that Redman had no significant limitations in her ability to carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to work in coordination with or in proximity to others without being distracted by them; to make simple work-related decisions; to ask simple questions or request assistance; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public transportation. (R. at 75-77.) She found that Redman had moderate limitations in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and

respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. at 75-76.) Jennings opined that Redman could perform simple and nonstressful work. (R. at 77.)

On January 4, 2012, Redman began physical therapy at Mountain States Rehabilitation for her complaints of low back pain. (R. at 718-29.) It was noted that Redman was unable to sustain any lasting pain relief. (R. at 718.) She was discharged on January 26, 2012, with a home exercise program. (R. at 719.)

On February 1, 2012, Dr. Larry Hartman, M.D., saw Redman for her complaints of low back pain. (R. at 683-84.) Examination of Redman's neck showed no tenderness and a good range of motion. (R. at 683.) Examination of Redman's back showed good range of motion, and straight leg raising tests were negative. (R. at 683.) Redman's neurologic examination was unremarkable. (R. at 683.) Deep tendon reflexes were fully intact and symmetric, and sensory and motor examinations were entirely symmetric. (R. at 683.) An MRI of Redman's lumbar spine showed disc desiccation at the L5-S1 level with no evidence of disc pathology or nerve root encroachment. (R. at 683.) A severe facet arthropathy was noted to be worse on the right, primarily related to a facet spur extending upwards from the S1 superior facet, curving beneath the pedicle. (R. at 683.) Dr. Hartman diagnosed myofascial back pain. (R. at 684.) He noted that there was no correlation for any right L5 radiculopathy, stating that Redman was entirely neurologically

-17-

intact. (R. at 684.)

On April 25, 2012, Jessica Pope, PA-C, a certified physician's assistant, saw Redman for complaints of low back pain and difficulty walking. (R. at 732-34.) Pope reported that Redman was in no acute distress. (R. at 733.) Examination of Redman's back showed no deformity, spasm or tenderness. (R. at 733.) Redman had normal motor strength in her upper and lower extremities bilaterally; she had intact sensation; normal gait; and her extremities showed no edema, atrophy or deformity. (R. at 733.) Pope diagnosed limb pain. (R. at 734.) On May 2, 2012, Redman complained of low back pain and bilateral leg pain, worse on the left. (R. at 730-31.) Straight leg raising tests were negative bilaterally. (R. at 731.) Redman had normal strength in her lower extremities, intact sensation and normal gait. (R. at 731.) An MRI of Redman's lumbar spine showed disc degeneration with a mild broad-based disc bulge at the L5-S1 level with questionable right L5 nerve root compression. (R. at 731.) Pope diagnosed lumbosacral spondylosis without myelopathy. (R. at 731.) This report also was signed by Dr. Gregory Corradino, M.D.

On May 22, 2012, Redman saw Melanie Martino, F.N.P., a family nurse practitioner with Dr. William E. Platt, M.D., for complaints of low back pain and tingling of her bilateral lower extremities. (R. at 706-09.) An MRI of Redman's lumbar spine showed disc degeneration primarily at the L5-S1 level, disc bulge at the L5-S1 level with degenerative changes in the right facet and possible compression of the right L5 nerve root with a partial S1-S2 disc space. (R. at 706.)

-18-

Martino noted no misalignment, asymmetry, crepitation, tenderness, masses, deformities or effusions in Redman's left lower extremity; however, Redman had tenderness of her right knee. (R. at 707.) Straight leg raising tests were negative. (R. at 707.) On June 26, 2012, August 2, 2012, and September 13, 2012, Redman had normal tone and strength and negative straight leg raising tests. (R. at 698, 701, 704.) Dr. Platt administered epidural steroid injections on May 25, 2012, July 6, 2012, and September 28, 2012. (R. at 690-92.)

On November 29, 2012, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Redman at the request of Redman's attorney. (R. at 765-75.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Redman obtained a full-scale IQ score of 91. (R. at 766.) Redman reported that she assisted in helping to watch her four-year-old niece. (R. at 769.) Lanthorn reported that Redman exhibited no signs of ongoing psychotic processes or delusional thinking. (R. at 769.) Redman reported that her anti-depressant medication had been helpful. (R. at 769.) She reported being sexually abused as a child by her step-grandfather and two cousins. (R. at 769.) Lanthorn diagnosed bipolar II disorder, recurrent major depressive episodes with hypomanic episodes; PTSD, chronic; somatization disorder, not otherwise specified; and personality disorder, not otherwise specified. (R. at 773.) He assessed Redman's then-current GAF score at 50.[5] (R. at 774.)

---

[5] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

-19-

Lanthorn completed a mental assessment, indicating that Redman had an unlimited ability to understand, remember and carry out simple job instructions. (R. at 776-78.) He found that Redman had a limited, but satisfactory, ability to understand, remember and carry out detailed instructions and to maintain personal appearance. (R. at 776-77.) Lanthorn opined that Redman had a seriously limited ability to follow work rules, to relate to co-workers, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 776-77.) He found that Redman had no useful ability to deal with the public and to use judgment. (R. at 776.) Lanthorn opined that Redman would be absent from work more than two days a month due to her mental impairments. (R. at 778.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review

-20-

does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Redman argues that the ALJ failed to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Campbell. (Plaintiff's

-21-

Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Redman also argues that the ALJ erred by failing to give full consideration to the findings of Lanthorn. (Plaintiff's Brief at 7-8.)

The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2015). However, "[c]ircuit precedent does not require that a treating physician's testimony "'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find Redman's argument that the ALJ failed to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Campbell unpersuasive. (Plaintiff's Brief at 5-7.) The ALJ noted that Gipe and Dr. Campbell opined that Redman could perform a reduced range of sedentary work[6] and that she was not emotionally stable to work. (R. at 22, 673-75.) They opined that Redman had chronic musculoskeletal back pain, but that her major problem for purposes of disability was bipolar disorder. (R. at 22, 673.) Gipe

---

[6] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

-22-

and Dr. Campbell also completed a mental assessment, indicating that Redman either was seriously limited or had no useful ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stress, to maintain attention and concentration, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 22, 676-77.) They stated that Redman was emotionally incapable of handling work stressors on a regular basis and that her absences from work each month would be unknown, as she had been unable to work regularly because of her illness. (R. at 22, 678.)

The ALJ noted that Gipe was not an acceptable medical source within the meaning of the regulations. (R. at 22.) *See* 20 C.F.R. §§ 404.1502, 404.1513(d)(1) (physician's assistant is not an acceptable medical source and is, instead, an "other source"). The ALJ stated that, although Dr. Campbell is an acceptable medical source within the meaning of the regulations, treatment notes show that Redman rarely saw him. (R. at 22.) He noted that the first time that Redman saw Dr. Campbell was on February 14, 2011, as she had to be evaluated by him in order for him to complete her disability papers. (R. at 22, 549-50, 569.) Furthermore, their finding that Redman is emotionally unable to work is not supported by their progress notes. (R. at 673-75.) Progress notes repeatedly show that Redman reported doing better since being on medication. (R. at 308-09, 366-67, 584, 586, 589-91, 596, 664, 769.) In fact, Redman testified at her hearing that medication helped her symptoms of depression "a lot." (R. at 37-38.) Redman reported that she was not having problems with anxiety or depression and that her back was doing 100 percent better since seeing a chiropractor and since she stopped passing

-23-

kidney stones. (R. at 367.) Gipe routinely reported that Redman had a "good," "great," "wonderful" and "excellent" affect. (R. at 308-09, 313, 364, 366-67, 565, 584, 589, 598, 664.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In addition, on September 8, 2011, Dr. Somiah found that Redman was alert and oriented, her speech was clear, her affect was full, her mood was euthymic, her thought process and content were normal, and her memory, judgment and insight were intact. (R. at 561.)

On February 14, 2011, Dr. Campbell noted that Redman was able to function on a day-to-day basis and perform her activities of daily living. (R. at 549.) On December 21, 2011, Dr. Hartman noted that Redman had full range of motion of the lumbar spine, negative straight leg raises, and her extremity examination was normal. (R. at 687.) She had a normal neurologic examination, including intact sensory and motor systems. (R. at 687.) In February 2012, Dr. Hartman noted that Redman's back revealed a "surprisingly good range of motion." (R. at 683.) She was entirely neurologically intact, and what discomfort she did have was eccentric towards the left side, which demonstrated no evidence of any nerve root encroachment at any level. (R. at 684.) On April 25, 2012, Pope noted that Redman had full strength, normal straight leg raises and gait, and her sensation was intact. (R. at 733.) She found no findings on Redman's MRI that would warrant neurosurgical intervention. (R. at 731.) Treatment notes in May, June, August and September 2012 showed that Redman had tenderness to palpation of the lower lumbar spine, but her gait was normal, and she had negative

-24-

straight leg raises. (R. at 698, 701, 704, 707, 731.) In October 2012, Dr. Campbell noted that Redman's musculoskeletal system was normal, including her gait and stance. (R. at 711-12.) Gipe routinely reported that Redman had full range of motion of her back and negative straight leg raising tests. (R. at 310, 364, 716-17.)

The record shows that Redman engaged in extensive daily activities, including taking care of her daughter, doing household chores, preparing meals, exercising, driving a car, grocery shopping, going out to lunch with friends, going to the movies, riding a bicycle and taking care of her four-year-old niece. (R. at 227-31, 246-50, 516, 525.) Furthermore, Redman stated that medication helped her low back pain "a great deal" and that, after treating with a chiropractor, her back pain was much better. (R. at 310, 313, 367, 515, 517, 520, 530-32.) *See Gross*, 785 F.2d at 1166.

Redman also argues that the ALJ erred by failing to give full consideration to the findings of Lanthorn and the resulting effects that her impairments would have on her work-related ability. (Plaintiff's Brief at 7-8.) Based on my review of the record, I find that the ALJ's finding as to Redman's mental residual functional capacity and his weighing of the psychological evidence is not supported by substantial evidence. The ALJ noted that he was giving Lanthorn's opinion little weight because he had examined Redman only once, in a consultative examination, and had never treated her. (R. at 22.) The ALJ also noted that Lanthorn's medical source statement was inconsistent with the medical evidence of record. (R. at 22-23.) Lanthorn opined that Redman had a seriously limited ability to follow work

-25-

rules, to relate to co-workers, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 776-77.) He found that Redman had no useful ability to deal with the public and to use judgment. (R. at 776.) Lanthorn opined that Redman would be absent from work more than two days a month due to her mental impairments. (R. at 778.) The ALJ noted that he gave some weight to the opinion of state agency psychologist Jennings, who found that Redman could perform simple and nonstressful work. (R. at 23, 77.) The ALJ limited Redman mentally to performing jobs that required only occasional interaction with the general public and that required only one- to two-step job instructions. (R. at 18.)

Based on my review of the record, I do not find that substantial evidence exists to support the ALJ's rejection of Lanthorn's opinions as to Redman's mental residual functional capacity. The record contains four mental assessments, all of which indicate that Redman was moderately limited or had no useful ability to make occupational, performance and personal-social work adjustments, more severe limitations than found by the ALJ, including maintaining attention and concentration, interacting with the general public, relating to co-workers, interacting with supervisors and dealing with work stresses. (R. at 60-62, 75-76, 676-77, 776-77.) While Dr. Somiah's opinion as to Redman's GAF score of 70 would support the ALJ's finding, he did not cite to this opinion in his weighing of the evidence and did not state, what, if any, weight he was giving it.

-26-

When the vocational expert was presented with a hypothetical individual who had no useful ability to deal with the public, to deal with work stresses, to maintain attention and concentration, to behave in an emotionally stable manner, to relate predictably in social situations and who would be absent more than two workdays per month, he stated that there would be no jobs available that such an individual could perform. (R. at 49-50.)

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's weighing of the medical evidence with regard to Redman's physical residual functional capacity. I do not find that substantial evidence exists to support the ALJ's finding as to Redman's mental residual functional capacity and his weighing of the psychological evidence. An appropriate order and judgment will be entered.

ENTERED: September 29, 2015.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE

-27-